Mr. Waxman, are you reserving five? Please. May it please the court. The district court erred on several grounds on each of the three issues it decided, invalidity, inequitable conduct, and Walker process, but the error common to all of them is that they all rest on the uncorroborated testimony of Transweb's president, a consummately interested witness. Well, the district court discussed a number, I think at least seven, pieces of corroborating evidence. And as our brief explains, none of those pieces of corroborating evidence actually corroborates the material fact that is needed to support a finding of invalidity. That is, they show that Transweb was at the expo, they show that Transweb, a new company, was, would be displaying and was displaying T-Flow and T-Milk. So they tend to support the witness's testimony. If I say, Your Honor, that, let's say in the, you know, in the era of anticipation of the Chevy Volt and its revolutionary battery, and GM announces there's going to be a car show in which it's going to be showing GM cars, and there is no mention whatsoever of the fact that the public is now going to get to see the much-anticipated technological advance, that is not corroboration of the material fact that is necessary to a finding of invalidity. And this court, over and over and over again, has made clear that what needs to be corroborated is that material fact. That was this court's holding in Juicy Whip, and Union Carbide, and Garner, and the Allergan cases. In fact, and indeed, the Finnegan case, which is perhaps the court's leading corroboration case, the witness testified, it wasn't even a party, the witness testified, Oh, no, no, no, I had, you know, I knew about all the elements of this invention. And the corroboration, the independent corroborating fact was an article that he had published that disclosed all but one of the elements of that invention. And this court held, look, the corroboration requirement we know from the barbed wire patent case, the Supreme Court has told us, it is very important. And what has to be corroborated, specifically corroborated by clear and convincing evidence, is the material fact on which the invalidity claim turns. And here, that was the display of oil-resistant, plasma-fluorinated material. And not a single one of those documents corroborates that. And in fact, there is very substantial evidence in the record of this case that that was not the case. This is not one of these cases where there are no documents that speak one way or the other to whether or not there was a public use of this plasma-fluorinated material. There are many pieces of evidence in the record that strongly indicate that it was not. And I can go through them if the court wishes. But the first is, of course, the multiple confidentiality requests and agreements that TransWeb insisted that customers or potential customers sign in the months after the expo. I mean, they, the very first shipment after the expo, they said to MSA, a respirator manufacturer in the United States, and said, we are providing these samples under our confidentiality agreement, and you are requested not to test them, not to discuss their properties with other suppliers, and to keep them confidential under our agreement. That's inconsistent with a few weeks earlier just handing these things out to anybody. Similarly, there is a brochure in the record in this case. And I really commend the court's attention to this. It's at page 51. Do we have the date of that brochure, by the way? I didn't see that it was dated in the record. It is not dated. The testimony was that it was provided to Mr. Lagar of Rical in Canada in 1997. His testimony was he thought it occurred when he met Mr. O'Galley on June 2nd. But it could have been sometime else in 1997. But this document is a damning indictment of his testimony, not corroboration. If you will examine page 5173, which is the third page of the brochure, and this bears review. While the court is looking for 5173, let me also say that Mr. O'Galley didn't disclose this assertive public use in any of his successive patent applications, including the one he filed in the year 2000 for precisely the invention that 3M got here, that is a hydrocharged plasma fluorinated electrode. But he never disclosed that there was a public use at the Expo in 1997 in his 2000 application. And he also never disclosed that either in his complaint alleging invalidity, either of the two contentions in this litigation, never mentioned it during fact discovery. This contention arose only at 16 months after the complaint was filed in response to our motion for summary judgment on invalidity. And that ought to give the court, should have given the district court, and certainly should give this court under the clear and convincing evidence standard that governs invalidity claims, very great pause. But if you have the exhibit here on page 5173, this is the brochure of a brand new company talking about its products. And on the left-hand side, they discuss T-Melt. And they say, T-Melt is fabricated from polyester, polypropylene, nylon, polyethylene, and PBT. And then it says, it can impart the fabric with electrostatic, antimicrobial, antistatic, fragrance, odor, or other useful properties to enhance performance. Nothing about oil resistance or anything like that until you get to the next page, which is TransWeb Today and Tomorrow. And there, TransWeb says, and I'm reading sort of in the middle of the page, we are to stay on the leading edge. We are committed to research and development of fiber media, filter media, that will be more efficacious in humid and oily conditions. That is, there is plenty of contemporaneous documentary evidence in this case, but all of it tends to show not that there was this sort of open display and distribution of this plasma-fluorinated material that had this remarkable quality. The significance of this document, it seems to me, depends entirely on when it was printed. And we know, well, I think we can know with some degree of certainty when it was printed, right? Because there's no question that TransWeb came into business in late 1996. In the April 1997 article that the district judge cited as one of the corroborating pieces of evidence from non-wovens industry, it says that this is a recently formed company and it has T-Flow and T-Melt, nothing about oil resistance. But then in September of 1997, TransWeb makes its first sale of T-Melt P. Setting aside the offer for sale on July 1st to Gerson. Well, I know you quarrel with whether that's an offer for sale, but it seems to me that the significance of the earlier events in light of this brochure comes into play here. Because back in 96, December of 96 and January of 97, it's pretty clear that they already had this T-Melt P because they were getting it tested. Oh, I... That's the document to MSA at 68, 69. And that looks like they're talking about the oily, i.e. plasma fluorinated media. Oh, I'll accept that for purposes of your question. And they sought a patent on it on the day that the expo was going on, right? They filed their patent application on plasma fluorinated. So they already had it. The question is, was it... So that seems to me to be significant support for the proposition that they may well have exhibited it because we know they had it. It would be a different matter if we thought there's no evidence that they even had it. Judge Boyce, the test here is not whether... I think that the 1996 document does not demonstrate that they had it. And the fact that they filed a patent application for it, a confidential patent application in the middle of the expo, doesn't bear one way or the other on it. Surely they would have filed it before the expo. Why does the 96... Well, in the same day of the expo. Why does the 96 document not support the view that they had a... at least something that performed well in an oily environment as of that time? It may show that, but the salient fact here is it was not a public use. We know from their subsequent provision of the T-MELTP samples to MSA in July of 1997 that there was a reference to an existing confidentiality agreement. So it may well have been provided on it. But let me just say that, first of all, the question is whether this actually corroborates the fact that it was there when there is every indication it wasn't. And even if it satisfies the corroboration requirement, the very fact that we're having this discussion based on a full trial record demonstrates how far this comes from clear and convincing evidence of an invalidating prior public use and how unbelievably far we are from inequitable conduct. You know, we're talking about the conduct of... Just so you're aware, you're well under your time. And I don't mean to run you out of your rebuttal time, but I'd like to turn you to another issue before you go away. Sure. May I just... I'm fully attentive to your issue. If I lose my rebuttal time, so be it. I just want to finish my thought here, which is we are not only far from clear and convincing evidence of an invalidating prior public use, and of course the judge didn't even address the rest of the other elements of obviousness, but how incredibly far we are from finding that Mr. Hansen and Dr. Jones, who didn't have any of these documents, who didn't have O'Galley's testimony, were from an inequitable conduct violation. Can I ask you about the antitrust damages? This is a difficult area of the law, I think partly because there are very few cases on this. So I looked at the cases you've all cited and did my best, but I understand your contention is that attorney's fees can't be part of the trouble damages here for the Walker antitrust claim. What's your best case on that? Is it the Comcast case? Yes. And where in Comcast do you think it really says that? Well, I think Comcast wasn't a Walker process case, but I think the same principles apply. And, you know, if Comcast means anything, it means that the damages that are collectible have to be tied directly to what constitutes antitrust injury. I don't have the page number, but Comcast says, quote, plaintiff's damages case must be consistent with the alleged anti-competitive effect of the antitrust violation. And the cases, and, you know, we... And what do you define as the injury here? Well, the injury, they have not claimed that the attorney's fees that they expended in defense of the infringement case or in support of their invalidity case themselves are antitrust injury or constitute antitrust injury. They haven't shown or even contended that they had to go out of business or they had to cut their production lines or that they did put on... Although they did say that... ...that they lost one sale. Well, didn't they have to sell at least part of their business to another company to be able to defend the suit? That was not a part of their evidence in this case. And I believe, you know, we'll hear from counsel. But they did not indicate at any time that it would be antitrust injury. The issue for me is, I think Comcast doesn't speak directly to it. I'll certainly support your case. There's at least, I found a case, and it's cited in the briefs, I'm pretty sure, from the Sixth Circuit that pretty clearly allows attorney fees to be included as part of an antitrust damages award. Do you think that case is just not applicable here because they haven't claimed it and they haven't shown it, or do you think it's wrong? I think it's not clear whether that case involved a pure Walker process... You're talking about the Carney case. Carney case. It's not clear whether that case involved a pure Walker process violation or Walker process plus sham litigation. But let's assume it's just a Walker process case. In that case, we think it was wrong. That's a 1977 case. We think it was wrongly decided. And the Third Circuit, which applies the relevant case law, they cite the In re Rossi case. That case, I think, pretty strongly supports us because it made clear that the damages had to flow from the alleged injury to competition, not to the competitor. And the language that they like just shows that you don't have to prove damages with exactitude. You have to show about what they are. But on your question about the main problem with Walker process, other than the fact that there is no fraudulent conduct proven or deceitful intent under inequitable conduct, it is their obligation to prove the relevant market. And they absolutely did not prove either a relevant product market or a geographic market. As to the former, their experts simply said the relevant market is this material, although he conceded that in the downstream market, respirator manufacturers who are looking for oil-proof respirators readily substitute other kinds of fabrics. I like your argument, Mr. Wright. If I could just ask one quick question. The assertion on the other side was that you didn't have an antitrust expert, is that right? It is correct. It's not our burden and their expert didn't establish the market. Thank you. Good morning, Your Honors. Michael Williams on behalf of TransWeb. You can have an extra minute if you need it, Mr. Williams. Thank you, Your Honor. 3M's arguments continue to ignore probably the most salient fact, which is a jury sitting through 11 days of testimony looking each witness in the eye, seeing all of the evidence, hearing all of the same arguments they're making now, unanimously concluded that 3M committed a deliberate and willful fraud on the patent office and it used these fraudulently obtained patents in an attempt to monopolize the market. Let's go to corroboration. I guess corroboration doesn't quite dispose of the whole case because I suppose that the invalidity questions could still be... the judgment could still be upheld on the prior sale, to the Gerson sale on July 1, the offer for sale, right? But that wouldn't affect the inequitable conduct or Walker process part of the case. You couldn't, in other words, rescue the inequitable conduct or Walker process part of the judgment by use of the Gerson sale since presumably Mr. Hansen and Mr. Jones had no reason to know of the Gerson sale. The only thing they are chargeable with is the expo, right? Well, it's not just the expo. This is something that I think 3M distorts in their papers and their argument. The corroboration issue is extremely narrow in this case. As Your Honor noted on Mr. Waxman's argument, there is no dispute that he had the invention, TMLP. He filed a patent application. There are documents showing he's manufacturing roles of this in February and March. There's also no dispute he was handing out samples to customers. But no evidence of that at the expo, right? Well, the expo is part of it. But there's no specific evidence that he handed out samples of the TMLP at the expo. Well, I disagree, Your Honor, and we think PTX 1338 is the most compelling evidence of that. But there's no clear tying of the PTX 1338 to the expo. But, Your Honor, the standard is to look at the totality of the circumstances here. And it's not simply whether he was handing it out at the expo. The issue is, was there a public use or offer for sale before the critical date? So the question becomes, and 3M misstates the record in a number of cases. They say there are no documents showing distribution of samples before the critical date that specifically mention TMLP. Well, that's clearly incorrect. In fact, if you look at A5381, there's a June 30, 1997 letter from Mr. O'Gally to the filtration group in which he says, I've shipped you a roll of TMLP 40P. There's the July 1, 1997 letter to, and with regard to the filtration group, there's no argument that that was covered by confidentiality. There's no evidence at all. But those don't really get you to the inequitable conduct and walk of process part of the case, do they? I believe all of this shows that it was corroborated. So there are two issues, Your Honor. There are two questions. Is it corroboration or is there an independent public use or sale? The latter does not help you with respect, it seems to me, to either inequitable conduct or walk of process. The former may help you because it buttresses the evidence that there was a distribution at the Expo. But what's your best piece of corroborating evidence with respect to the Expo? Your Honor, I just want to note that with regard to the point about the offer for sale, I do think it would also bolster the issue regarding inequitable conduct and walk of process fraud for this reason. The critical question is whether TMLP could be considered prior art to their patent claim. That was the issue. That's what corroboration goes to. It could be considered prior art if it was publicly available or offered for sale before the critical. I understand that and that goes to invalidity but I don't see how that pertains to Mr. Jones, Rousseau and Hanson's knowledge and Ligari, for that matter, knowledge of the prior public use or sale. There's no way that they had any knowledge of these letters that were sent to Filtration and Gerson, right? No, there's no evidence of that. So that doesn't get you anywhere on inequitable conduct? No, but we believe there was more than sufficient evidence for the jury and the court to conclude that they were aware of the public uses regarding TMLP prior to the critical date. And again, once again, what 3M is attempting to do is exactly what this court said shouldn't be done in the IDENTA case. You can't deconstruct each individual piece of evidence and say, well, this doesn't have all of the material factors so it can't be corroboration and this one doesn't so it can't be corroboration. You have to look at all of the circumstances. But again, what's your best piece of evidence corroborating that there was a display or distribution of a TMLP at the Expo as opposed to simply TMLP non-P? I would come back to PTX 1338 which was a sample pack that was found in 3M's files and there was evidence that an individual from RACAL attended the Expo and that was what the court described as killer evidence that this is what he was handing out. But there was also the court was interested in what it believed was false testimony in relation to that attendance. Well, that's part of it. That he said he had visited a, he hadn't been anywhere near it and yet he had visited a booth next admitted visiting a booth that was next to your booth. That was part of it but it was also the false testimony of Mr. Legar claiming he got that sample pack on June 2nd, 1997. Again, the corroboration standard requires considering everything and we have the Expo brochure, I mean the Expo brochure which mentions he's handing out TMLP polypropylene and the evidence on that issue is that there was no non-fluorinated T-Melt polypropylene at that time. T-Melt referred to their high-performance material. The polypropylene one was the plasma fluorinated. No one would be going there to hand out a typical melt-blown standard web that had been in existence for decades. It wasn't anything special. Where in the record? I was focusing on that question and I could not find anything that pinned that point down. Where in the record do you look to to say that if it was polypropylene it was plasma fluorinated as of April 30th of 1997? I will find the site. There's a discussion I think it's page 1384 of the joint appendix in which Mr. O'Galley is testifying and he's talking about the early days T-Melt and the later days TMLP and so forth. But I didn't think that pinned it down. At least it didn't for me. Was there something else? Or are you relying on me? It's a testimony that 3M cites for this idea where they say there was non-fluorinated T-Melt. What Mr. O'Galley said is yes, there was non-fluorinated T-Melt but those were made out of polyester and nylon. That's at 1384, that's the page I'm talking about. That's an important point so let's take a look at that because I don't think he really pins that down. Since he was your witness you were entitled to get that cleared and I didn't see it got cleared. So, looking at that testimony at 1384 starting at line 4 and in the early years of TransWeb 96-97 my understanding is that T-Melt could refer either to an oil-resistant product or a product that was not oil-resistant. Is that right? Answer, in early 96 and 97 as you know, see the article, it talks about high-performance melt blooms and at that time T-Melt only referred to high-performing melt blooms which were oil-resistant or plasma-fluorinated. Okay, and then he continues on and he said T-Melt about line 19 referred to polyester nylon which were not oil-resistant T-Melt. Go ahead. The polypropylene though was the... But that's what he doesn't say. He doesn't ever say polypropylene is T-Melt P. Well, but it goes on to say so T-Melt in 97 could refer to non-oil-resistant products. Answer, if they were polyester and nylon materials. You're taking that as an indication that if they were not polyester or nylon i.e. if they were polypropylene he's saying it must have been T-Melt P. Right, because T-Melt referred to high-performance and there's nothing high-performance about a non-fluorinated electric melt-blown web. It's been in the industry for decades that 3M's own patents recognize. And I believe, Your Honor, although I can't cite to it right hand, I believe there was other testimony on his direct where he discussed and explained what T-Melt polypropylene referred to in that regard. So I do think, again, considering all of the in the totality of the circumstances there's more than sufficient corroborating testimony. And if I recall correctly in the brochure of the expo there was a reference to polypropylene, wasn't it? It said T-Melt polypropylene nylon and polyester. Okay. And, Your Honor, in terms of other evidence though, I mean again, and I'll just cite some for the record and again, you have the Gerson letter which is an offer for sale A5150 which specifically refers to T-Melt 30P, 40P and 50P. Now there's no question that by the time you get to, well even in June you've already got references to the oily slash P T-Melt P. So there's no question that that's all over the record. The question is, does that date back? Can you date that back to and establish that there was a an exhibition of those materials at the expo? Well, but even giving out samples to customers was part of it and that's what we pointed to the letter to filtration group. That's a public use. It may be but there's no way that at least there's no evidence that 3M or its predecessor had any knowledge of the samples given away to MSA or filtration group or what's the other one? Four State. But I think that's a different inquiry, Your Honor. I mean again, the corroboration goes to can this be considered prior art and then if so, what was 3M's knowledge? And in that regard the evidence was overwhelming as the jury unanimously concluded that they committed fraud. By the time they represented to the patent office they knew those statements were false. They knew that there had been prior use, public use at the expo and other things. I mean keep in mind Jones is directed by his supervisor to check out TransWeb. There's internal emails targeting TransWeb and their products. Immediately after the expo they send emails around talking about TransWeb and its T-Melt products. They invite TransWeb to 3M to talk about their products in June of 97 and he says he tells them about everything. He's trying to get them as a customer. And at that time it didn't matter to 3M. They didn't care about his plasma fluorinated material because they had their patent on their PFOS material to make fluorinated materials. It was only until 1998 when they had to stop using that material because of EPA issues that they realized they had a problem on their hands. So they dusted off their invention on plasma fluorination. They rushed the filing application and then they realized that there's this paper trail showing that TransWeb was handing this stuff out and it was publicly available. This idea that oh it didn't mention T-Melt P is absurd. 3M didn't have any distinction. They had no reason to know whether there was a fluorinated or non-fluorinated T-Melt as the district court found. All they know is they're testing products called T-Melt which are being advertised in a non-moving industry magazine in 1997 are being displayed at their booth at the expo and then they create this false paper trail to submit to the patent office. And again, the jury unanimously concluded on all of these things and it entitles significant deference. I don't believe Judge Hochberg's opinion could be found to be clear error on factual findings when those findings are identical to the findings that the jury made. Even on the issue of inequitable conduct which was submitted to the jury as an advisory verdict at 3M's request and even though they were told they did not need to be unanimous on that, they all came back unanimously, found that intent to deceive was the single most reasonable inference according to the judge's instructions. Don't talk about the antitrust Yes, I did want to get to that. So 3M conflates and confuses two very distinct concepts in antitrust law. One the antitrust injury doctrine and two antitrust damages. Antitrust injury requires that you show harm to competition. This was an attempted monopolization claim. By very definition it did not succeed. So in an attempted monopolization claim the standard is to look at if they had succeeded at running TransWeb out of the market would there have been harm to competition? And to that the jury concluded, we had expert testimony that showed TransWeb is the only other manufacturer in the world of plasma fluoridated material. I understand that but that's where I'm having some problems because if you define the injury in that way how are your attorney's fees in defending against the patent suit a result of that injury? Because I think Comcast at least makes it clear that you have to tie the injury to the specific damages. So two ways, Your Honor. First of all antitrust injury is a unique and somewhat of a misnomer in antitrust law because it's really a standing doctrine as to whether you have standing to pursue this. So you could suffer all the harm in the world as a company but if there's no harm to competition or threatened harm to competition you don't have standing. But the CUNY case is right on point and explains it very well. If there's a causal connection between the antitrust violation and the incurrence of the fees and costs to defend against a fraudulently obtained patent in a patent infringement suit, those damages flow from the injury. What else would the injury be? They sued us on fraudulently obtained patents in an attempt to force us out of the market. Of course the attorney's fees are a harm that are caused to TransWeb that proximately flow from the infringement lawsuit that we were required to defend against. And so Kearney, Hansgard, the Dairy Maid's case from Seventh Circuit, they all explain that The issue I'm having on this I guess is that at least some of the cases you cite are the sham litigation cases which you clearly didn't win that claim here. If you can get in those cases attorney fees are obviously tied to it because it's the whole point. If you have to defend against sham litigation you're incurring attorney's fees. But if you have sham litigation I don't see any I'm being inarticulate but I don't see any difference between the theory of damages you're getting here and you would be under sham litigation. So I don't understand quite the difference if there's any light of day. It's a false distinction that they're making. There is no difference because in both cases the company is the antitrust violation is the lawsuit. That's what was going on. They used the lawsuit in an attempt to monopolize Wrap up your time. But in this case they specifically found against you on the sham litigation. But Walker Process the way they and this court has explained it even in the context of standing to bring a Walker Process claim the only way they can enforce fraudulently obtained patents is by threatening or bringing suit against you. So those harms do flow and it's a jury found and we believe it's clearly entitled under the case law. We don't think there's any case law that goes to the contrary. Any other questions? Your time's up. You not only used up your time you said you didn't care if you used up your time. That was an error on my part. Yes it was. Your time's up. I'm collecting my notes.